IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ANNA MAE SPRINGER HUNT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-24-580-R |
| | ) | |
| LELAND DUDEK, | ) | |
| Acting Commissioner of Social | ) | |
| Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for benefits under the Social Security Act. The Commissioner has answered and filed a transcript of the administrative record (hereinafter TR. _____). This matter has been referred to the undersigned magistrate judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B)-(C). The parties have briefed their positions, and the matter is now at issue. It is recommended that the Commissioner's decision be **AFFIRMED.**

## I.    PROCEDURAL BACKGROUND

Plaintiff applied for supplemental security income (SSI) on May 31, 2022, alleging disability beginning January 1, 2016. The Social Security Administration denied Plaintiff's application for benefits. Following an administrative hearing, (TR. 46-79), an Administrative Law Judge (ALJ) issued an unfavorable decision. (TR. 17-38). The Appeals

---

[1] Leland Dudek became the Acting Commissioner of Social Security Administration on February 18, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Council denied Plaintiff's request for review, (TR. 1-5), making the decision of the ALJ the final decision of the Commissioner.

## II.    THE ADMINISTRATIVE DECISION

The ALJ followed the five-step sequential evaluation process required by agency regulations. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); 20 C.F.R. § 416.920. At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity after her alleged onset date. (TR. 19).

At step two, the ALJ determined Plaintiff suffers from the following severe impairments: degenerative disk disease of the lumbar spine, obesity, hypertension, restrictive airway disease, and seronegative rheumatoid arthritis. (TR. 20).

At step three, the ALJ found that Plaintiff's impairments, considered individually or in combination, did not meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (TR. 23).

At step four, the ALJ concluded Plaintiff has the residual functional capacity to:

[P]erform sedentary work as defined in 20 CFR 416.967(a), with the following limitations: Over the course of an 8-hour workday with standard (i.e., morning, lunch and afternoon, or the equivalent) work breaks, she can lift, carry, push and pull up to 10 pounds occasionally and smaller items such as docket files, ledgers and small tools more frequently; sit 6 hours; and stand and walk for a combined total of 2 hours; occasionally stoop, kneel, crouch, crawl and balance as those terms are defined in the Selected Characteristics of Occupations; occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds, or otherwise work at unprotected heights; tolerate occasional exposure to pulmonary irritants such as dust, fumes, odors and gases; reach, handle, and finger frequently but not constantly; cannot operate heavy machinery or perform work involving commercial driving; and can sustain attention and concentration for detailed but not complex work tasks.

(TR. 24-25). The ALJ next concluded Plaintiff could not perform her past relevant work as a gambling cashier, money counter, or janitor. (TR. 36).

At step five, the ALJ considered Plaintiff's age, education, work experience and RFC and concluded there were jobs existing in significant numbers in the national economy that she could perform. (TR. 36). At the administrative hearing, the vocational expert (VE) identified three jobs from the *Dictionary of Occupational Titles* (DOT) that Plaintiff could perform: surveillance system monitor, (DOT #379.367-010, a sedentary, unskilled job with 35,000 such jobs existing in the national economy); document preparer (DOT #249.587-018, a sedentary, unskilled job with 25,000 jobs existing in the national economy); and addresser, (DOT #209.587-010, a sedentary, unskilled job with 2,000 of existing in the national economy). (TR. 37). The ALJ adopted the VE's testimony and concluded Plaintiff was not disabled. (TR. 38).

## III.  ISSUES PRESENTED

On appeal, Plaintiff argues: (1) the ALJ did not "understand or appreciate" the rheumatologist's physical exam findings of "dactylitis" or "swan neck deformity," (ECF No. 7:11-13); (2) the ALJ's consistency evaluation did not meet the requirements of Social Security Ruling (SSR) 16-3p, (ECF No. 7:14-25); and (3) the ALJ's function-by-function analysis did not meet the requirements of SSR 96-8p, (ECF No. 7:25-31).

## IV.  STANDARD OF REVIEW

This Court reviews the Commissioner's final decision "to determin[e] whether the Commissioner applied the correct legal standards and whether the agency's factual findings are supported by substantial evidence." *Noreja v. Commissioner, SSA*, 952

F.3d. 1172, 1177 (10th Cir. 2020) (quoting *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014)).

Under the "substantial evidence" standard, a court looks to an existing administrative record and asks whether it contains "'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (alteration in original). "Substantial evidence . . . is 'more than a mere scintilla.' It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 103 (internal citation omitted) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). While the court considers whether the ALJ followed the applicable rules of law in weighing evidence in disability cases, the court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015) (quoting *Newbold v. Colvin,* 718 F.3d 1257, 1262 (10th Cir. 2013)). Nevertheless, the Court must reverse decisions if the ALJ has simply picked out and relied on evidence that supports her conclusion without discussing relevant evidence to the contrary.

## V.    ANALYSIS

### A.    Plaintiff's Dactylitis and Swan Neck Deformity Diagnoses and Pain Management Medications

Plaintiff's hand problems began before the relevant Social Security period. Plaintiff reported an abnormal feeling in her left ring and pinky fingers in October 2021. (TR. 598). Pain management records from March 2022 show left index trigger finger without further follow-up screenings or tests, and emergency room records for an unrelated injury from

April 2022—just before the beginning of the relevant period—revealed no hand deformity and full range of motion for all joints. (TR. 798 & 646-47).

Plaintiff reported no hand or finger issues at primary care, pain management, or orthopedic visits from May 2022 through March 2023; visual overviews of her extremities showed no abnormalities. (TR. 714, 799, 801, 803, 805, 807, 809, 882, 1131 & 1154). State agency consultants reviewed Plaintiff's medical evidence and assessed capacity to work a full range of light work without any manipulative limitations. (TR. 119-20, 128 -29).

Plaintiff saw a rheumatologist in April 2023, complaining of fatigue and reporting joint pain, hand swelling, difficulty grasping objects, and difficulty bending her fingers or making a fist. (TR. 779, 1062). The physical exam notes showed transient hand numbness, swelling in both hands, tenderness in her finger joints, dactylitis in both hands, and joint damage with swan neck deformity in her left hand. (TR. 1065). Plaintiff was diagnosed with inflammatory arthritis. She received a Kenalog and Toradol (steroid and NSAID) shot and was started on hydroxychloroquine, an immunosuppressive medication. She was also directed to continue taking ibuprofen and manage pain with a narcotic. (TR. 1065).

In May 2023, Plaintiff returned to the rheumatologist for a medication change due to side effects from the hydroxychloroquine. She was switched to sulfasalazine and was given another Kenalog and Toradol shot. (TR. 1060). Exam findings remained the same. (TR. 1059). At a follow-up in July 2023, Plaintiff reported that sulfasalazine made no difference in her hand pain. (TR. 1048). Her exam showed swelling in both hands, tenderness in many of her finger joints, dactylitis in both hands, swan neck deformity in

her left hand, tightness and stiffness in her fingers, and pain with the use of her fingers. She was advised to continue sulfasalazine and to start methotrexate. She received another Kenalog and Toradol shot. (TR. 1052). Her exam at an August 2023 follow-up showed the same deformities, pain, and stiffness as in July. (TR. 1046). She reported side effects from the methotrexate, so she was advised to stop that medication but continue with sulfasalazine. (TR. 1042 & 1046). The rheumatologist recommended Humira, which she said she was willing to try. (TR. 1042). Her diagnosis was adjusted to rheumatoid arthritis. (TR. 1046).

At a pain management appointment later that month, Plaintiff mentioned being treated for arthritis but reported that her medications were helping manage her pain and that she had "[n]o issues with medications." (TR. 1096). Her musculoskeletal exam, including visual overview of all four extremities, was normal. (TR. 1095). Notes from her next pain management appointment in September 2023 show the same. (TR. 1257-58).

Plaintiff had a final rheumatology follow-up in October 2023, where she complained of hand pain but said she was functioning better with her medications. (Plaintiff reported that with medication she "can get up" and that medications brought her pain level down from a level ten to a level seven.) (TR. 1195). She had not started Humira because she was afraid of giving herself a shot. (TR. 1195). She was told to continue with sulfasalazine and to start leflunomide. (TR. 1200). She was told to return in three months, but the record does not reflect any further rheumatology follow-ups. (TR. 1200).

At pain management visits later in October and November 2023 and January 2024, Plaintiff's musculoskeletal exams and visual overviews of all four extremities were normal. (TR. 1247-54). She specifically mentioned hand pain at pain management visits in February and March 2024, but records appear to show that no additional treatment was discussed and no related abnormalities observed. (TR. 1243-44). The pain management provider noted at the first visit that medications were controlling her musculoskeletal problems. (TR. 1244).

### B.    Plaintiff's Argument That the ALJ Did Not Understand Her Dactylitis and Swan Neck Deformity Diagnoses Is Meritless

Plaintiff claims the ALJ's decision demonstrates ignorance of the nature of dactylitis and swan neck deformity. (ECF No. 7:11-7:13). This is based on the lack of mention of these terms on the pages where "the ALJ presented her analysis of [P]laintiff's claim and limitations," though the ALJ does refer to both conditions by name on a prior page. (ECF No. 7:13); *see also* (TR. 29). Plaintiff argues that the ALJ could not have appropriately accounted for the symptoms caused by these afflictions in her RFC because she did not understand their severity. (ECF No. 7:13 ("Clearly, 'some inflammatory findings', 'arthritic findings', and 'hand findings' is wholly inadequate to show that the ALJ had any understanding of the serious and substantial problems/limitations posed by these objectively observed conditions. Indeed, the fact that the rheumatologist wrote 'joint damage' and 'deformity' shows that this was not a minor problem."). The undersigned disagrees.

Dactylitis is severe swelling in the fingers or toes, colloquially known as "sausage fingers." (ECF No. 7-1). Swan neck deformity refers to the shape the finger makes when the middle joint is bent backward more than is normal. (ECF No. 7-3). Both can be caused by arthritis. (ECF Nos. 7-1 & 7-3). The ALJ's understanding is evinced by her explanation of Plaintiff's complaints of joint pain and hand swelling that led to her diagnoses of dactylitis and swan neck deformity at an arthritis center:

> [I]n April 2023, [Plaintiff] presented for an arthritis center visit where she complained of fatigue and joint pain, with whole body pain worse on her shins, and with her hands swelling and difficulty grasping objects and difficulty bending her fingers and making a fist. Physical examination found that she had swelling to the bilateral hands and tenderness to all MCP/PIP joints as well as dactylitis in bilateral hands and joint damage with a Swan neck deformity noted to the left hand 2-5 and she had tight and stiff fingers and pain with use.

(TR. 29) (internal citations omitted); *see also* (TR. 35) ("Also, the undersigned added some manipulative limitations given the more recent diagnosis of rheumatoid arthritis with some of the hand findings."). The ALJ substantiates her characterization of Plaintiff's hand pain by pointing to arthritis center records that specifically mention dactylitis and swan neck deformity in the context of Plaintiff's description of pain and swelling: "Hands with bilateral swelling and tenderness to call MCP/PIP joints. Dactylitis in bilateral hands. Joint damage noted with swan neck deformity noted to left hand 2-5. She is tender to knees, hands, and back." (TR. 1065); *see also* (TR. 29). This same record mentions "[h]ands swelling and difficult to grasp objects" and "difficulty bending her fingers and making a fist." (TR. 1065); *see also* (TR 29). Although the above-quoted passage is not within the page range Plaintiff takes issue with, the ALJ both cites to the record about

dactylitis and swan neck deformity and describes its content within that range. *E.g.*, (TR. 31-32) ("It is noted that, in the claimant's arthritis center records, there is mention of arthritic findings in the claimant's hands mainly.").

The undersigned is not convinced by Plaintiff's argument that the ALJ committed reversible error in failing to mention dactylitis and swan neck deformity by name on the pages where "the ALJ presented her analysis of [P]laintiff's claim and limitations" and finds no error. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) ("Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.").

## C.    The ALJ's Consistency Evaluation Meets the Requirements of Social Security Ruling 16-3p

### 1.    ALJ's Duty to Evaluate Plaintiff's Subjective Allegations

SSR 16-3p provides a two-step framework for evaluating a claimant's subjective allegations. SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). First, the ALJ must make a threshold determination regarding "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *2. Second, the ALJ will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* At this second step, the ALJ will examine the objective medical evidence, the claimant's statements about her symptoms, information from medical sources, and "any other relevant

evidence" in the record. *Id.* at *4. SSR 16-3p also directs the ALJ to consider the following

seven factors in evaluating the intensity, persistence, and limiting effects of the claimant's

symptoms:

- [d]aily activities;

- [t]he location, duration, frequency, and intensity of pain or other symptoms;

- [f]actors that precipitate and aggravate the symptoms;

- [t]he type, dosage, effectiveness, and side effects of any medication;

- [t]reatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

- [a]any measures other than treatment a claimant has used to relieve pain or other symptoms; and

- [a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7. Finally, in evaluating a claimant's subjective statements, the ALJ must provide

"specific reasons for the weight given to the [claimant's] symptoms, [which are]

consistent with and supported by the evidence, and [ ] clearly articulated" for purposes

of any subsequent review. *Id.* at *9.

## 2. The ALJ's Evaluation of Plaintiff's Subjective Allegations

The ALJ summarized Plaintiff's subjective allegations, explaining Plaintiff "indicated

that she was diagnosed with rheumatoid arthritis last year and her hands are swollen,

and she is in constant pain":

[Plaintiff] testified that her right index finger was injured in a car wreck, causing pain and cramping in her hands when she writes. She said that she has difficulty holding things and drops items and has problems picking up small items. When she picks things up, she said that it is painful, and she gets a sharp nerve feeling and her hand will lock up. She detailed that this

happens about 1-2 times a week depending on what she is doing. She indicated that she has the same type of problems with the left, but the right is worse. She said that both hands swell and that she has swelling in her feet and legs. She said that she takes water pills and must elevate her feet to deal with swelling, which she does once per day.

(TR. 25-26); *see also* (TR. 97-98).

The core of Plaintiff's argument is that in her consistency determination the ALJ downplayed the effects of Plaintiff's dactylitis and swan neck deformity to justify limiting her to frequent—rather than occasional—reaching, handling, and fingering.

The ALJ evaluated Plaintiff's subjective allegations with particular emphasis on how often the records show hand-related complaints or findings:

While the claimant alleges significant limitations with using her hands, the record lacks evidence of significant findings, abnormalities, or complaints regarding the claimant's hands until the arthritis center records from 2023 show some inflammatory findings. Prior to that, there is an isolated mention of trigger finger that did not clearly persist for duration (12 consecutive months or more). Other hand abnormalities were generally not noted other than that (for example, there no mention of the deformities indicated [in Plaintiff's arthritis center records]). Other than past issues with trigger finger and other than her arthritis center records, her records are not very significant for hand complaints, and the records in [the arthritis center records] are in the context of new diagnosis of (and treatment for) rheumatoid arthritis (seronegative). The record overall does not support a conclusion that manipulative tasks would have been limited to less than frequent for any consecutive 12-month period since the application date. It is noted that, in the claimant's arthritis center records, there is mention of arthritic findings in the claimant's hands mainly. Otherwise, such issues were not consistently mentioned so much elsewhere, though are consistently here starting around April 2023. These records show that the claimant was diagnosed with seronegative rheumatoid arthritis, but was negative for rheumatoid arthritis and Sjogren's and her ANA was also negative. The claimant's sedimentation rate was mildly elevated, in the low 20's, though her CRP was significantly elevated. Some of the more recent records later in 2023 do also show the findings regarding the claimant's hands, but still, these are not terribly persistent throughout the record. The record shows that the claimant has past issues with trigger

finger. She also had a positive left hand Phalen's test at the 4th and 5th digits and a positive ulnar nerve compression tests. Still, the record overall generally lacks other mention of problems/deformities regarding the claimant's hands or fingers. These issues are shown again in October 2023 in post-hearing records, but the undersigned still does not find that such issues are mentioned in medical evidence of record with a frequency that suggests that she can use her hands only occasionally (or less) in a work setting.

(TR. 31-32) (internal citations omitted).

Plaintiff first argues that the ALJ erred by characterizing her rheumatological findings of dactylitis and swan neck deformity as "some inflammatory findings." (ECF No. 7:16-17). As support, she points to *Eva D.B. v. Kijakazi*, in which the court reversed the ALJ's RFC determination because it overlooked a consultative examiner's findings of "'significant' osteoarthritis in both . . . hands, with hypertrophic joints and 'swan-neck' deformity" and "problems gripping with her left hand." 2021 WL 4487600 at *4 (N.D. Okla. Sept. 30, 2021). The court found the ALJ had "failed to acknowledge significantly probative evidence regarding the severity, length, and symptoms of [the claimant's] physical impairments." *Id.* at *5. Plaintiff suggests the ALJ made the same reversible error here. But the ALJ's error in *Eva D.B.* was in "simply ignoring" the consultative examiner's findings. *Id.* The ALJ had, in the first instance, cited those findings to determine the claimant's RFC beginning on the date of the examination but did not refer to them on remand, when the task was to determine the claimant's RFC for the period immediately before the examination: "Implicitly, then, the ALJ found [the consultative examiner's] report [was] not probative of Plaintiff's RFC prior to [the examination date]." *Id.* The court explained that "[i]t is implausible that [the examiner's] findings on [the

examination date] were probative to [the claimant's] functional limitations beginning on that date, but not earlier," especially since the examiner observed the claimant's complaints of problems having persisted "for years." *Id.*

Although the claimant in *Eva D.B.* shares some of Plaintiff's symptoms, the ALJ in this case has not made the same error. ALJ considered Plaintiff's dactylitis and swan neck deformities, basing her consistency determination the fact that Plaintiff's hand pain is not regularly mentioned outside the arthritis center records, including at several pain management visits. This was not an implausible finding that longstanding symptoms became relevant to Plaintiff's RFC overnight. It is up to the ALJ to weigh the evidence, and this Court will only disturb her findings in the event of legal error. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) ("We do not reweigh the evidence or retry the case, but we 'meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met.'" (quoting *Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005); *see also Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("The possibility of drawing two inconsistent conclusions from the evidence does not prevent an [ALJ's] findings from being supported by substantial evidence." (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004))).

Plaintiff next argues the ALJ's emphasis on a "recent diagnosis" and a "12 month period" ignores Plaintiff's rheumatology visits more than twelve months before the decision date. (ECF No. 7:17-18). Plaintiff argues without citation to authority that a six-month timeframe would be more appropriate because her dactylitis and swan neck

deformity are "not just instantaneous" and "are not just deformities that could be expected to disappear" after the last arthritis center visit. Plaintiff appears to argue alternatively that the ALJ should have inferred her hand symptoms had persisted for twelve months because the last arthritis center visit was in October 2023, more than twelve months before the decision date, and Plaintiff complained of significant limitations at the hearing level. Plaintiff does not develop an argument for why the ALJ's twelve-month analysis constitutes legal error. *See Keyes-Zachary*, 695 F.3d at 1161 ("We will consider and discuss only those of her contentions that have been adequately briefed for our review."). The undersigned notes, though, that the most obvious reading of the ALJ's analysis is not that Plaintiff's dactylitis and swan neck deformity did not exist for twelve consecutive months, but that neither condition limited Plaintiff's capacity for fine manipulation to only occasional reaching, handling, and fingering for the twelve-month disability reporting period. *See* SSR 82-52 (explaining duration requirement)[2]; *cf. Valdez-Powell v. Colvin*, 2015 WL 5719646, at *4-5 (D. Colo. Sept. 30, 2015) (affirming ALJ's decision to give little weight to provider's opinion where certain restrictions "appeared to be temporary in nature and therefore not probative as to plaintiff's permanent RFC").

Plaintiff next argues that the ALJ should not have based her RFC determination on the observation that Plaintiff's hand problems are "not terribly persistent" in the record because the record includes only one rheumatology record, and "[o]ne would expect a more detailed examination by a rheumatologist than by a [primary care physician] or

---

[2] Social Security Ruling 82-52 was rescinded and replaced by Social Security Ruling 23-1p, effective November 7, 2023.

cardiologist." (ECF No. 7:18-19). The persistence observation is in the context of a paragraph documenting how often Plaintiff's hand issues are documented in the record, either because Plaintiff complained of pain or because a treatment provider noted a problem. (TR. 31-32). Immediately after noting that "[s]ome of the more recent records later in 2023 do also show the findings regarding the claimant's hands," the ALJ explains that "the record overall generally lacks other mention of problems/defects regarding the claimant's hands or fingers" and concludes that "such issues" are not "mentioned in the medical evidence of record with a frequency that suggests that she can use her hands only occasionally (or less) in a work setting." (TR. 32). So, the ALJ looked to how often providers noted hand issues or defects—based on either Plaintiff's complaints or their own observations—to gauge how much her dactylitis and swan neck deformity limit her fine manipulation. It is true that a specialist would be expected to conduct a more detailed examination than a provider with a different area of expertise. However, the ALJ did not merely rely on the absence of findings but compared them to specific relevant test results. (TR. 32) ("These records show that the claimant was diagnosed with seronegative rheumatoid arthritis, but was negative for rheumatoid arthritis and Sjogren's and her ANA was also negative. The claimant's sedimentation rate was mildly elevated, in the low 20's, though her CRP was significantly elevated." (internal citations omitted)). It is up to the ALJ to decide how to weigh the evidence, and the undersigned finds no legal error in her persistence analysis. *See Vigil*, 805 F.3d at 1201.

Plaintiff next argues that in relying on relative infrequency of hand problem notations in the overall record, the ALJ ignored the rheumatologist's consistent notations

of dactylitis and swan neck deformity. (ECF No. 7:20). However, the ALJ detailed Plaintiff's arthritis center visits, noting that "there is mention of arthritic findings in the claimant's hands mainly." (TR. 29, 31-32).

Plaintiff relatedly argues that the regularity with which providers have noted her hand deformities does not bear on whether she can use her hands frequently or whether she should be limited to occasional handling or fingering. (ECF No. 7:20). Plaintiff emphasizes that the arthritis center records show swelling and difficulty grasping objects, bending her fingers, or making a fist, arguing the "dactylitis and swan neck deformity physical exam findings support that statement" and "also show that she was unable to functionally use her hands and fingers for the type of work used to deny the claim." (ECF No. 7:20). The ALJ's task is not to determine whether the claimant suffers from these physical deformities, but to evaluate any resulting functional limitations. *Paulsen v. Colvin*, 665 F. App'x 660, 668 (10th Cir. 2016) ("Diagnosis of a condition does not automatically mean that the claimant is disabled; what matters is whether the condition results in work-related limitations." (citing *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988)); *see also* 20 C.F.R. § 416.945(a)(1). Plaintiff's argument amounts to a disagreement with the ALJ's limitation to frequent manipulation and is therefore meritless.

Finally, Plaintiff argues the ALJ did not consider the type, dosage, effectiveness, and side effects of Plaintiff's rheumatology medications. (ECF No. 7:20-25). To the contrary, the ALJ detailed Plaintiff's experimentation to find an administrable medication that controlled her symptoms with tolerable side effects. The ALJ explained that Plaintiff was "administered an injection of Kenalog and Toradol" in April 2023, after being

diagnosed with polyarthritis; she was "she was injected with Kenalog and Toradol" in July 2023, after complaining of worsening pain; and was prescribed Humira injections in August 2023 after being diagnosed with rheumatoid arthritis with negative rheumatoid factor. (TR. 29). The ALJ explained that she reported in October 2023 that she "that she had not started on Humira as she was fearful of the needle and giving herself a shot." (TR. 30). Plaintiff points to some medications the ALJ did not specifically discuss: a third injection in May 2023; hydroxychloroquine (which had intolerable side effects); and sulfasalazine (which, it is later noted, did not improve her functioning); and methotrexate (which also had intolerable side effects); and leflunomide. (ECF No. 7:22-23). The undersigned finds the ALJ's omission of Plaintiff's ineffective oral medications (and one injection) is not reversible error, as the ALJ broadly considered her medication attempts and noted their effectiveness by acknowledging Plaintiff's October 2023 reports of continuing pain despite medication. "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). While incomplete, the ALJ's explanation of Plaintiff's medication is sufficient. *See Keyes-Zachary*, 695 F.3d at 1167 ("[S]o long as the ALJ 'sets forth the specific evidence he relies on in evaluating the claimant's credibility,' [s]he need not make a 'formalistic factor-by-factor recitation of the evidence.'" (quoting *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000)).

The ALJ's analysis is consistent with SSR 16-3p. Plaintiff's argument that the ALJ inappropriately downplayed the effects of Plaintiff's dactylitis and swan neck deformity to justify her RFC limitation to frequent manipulation is unavailing. Plaintiff makes no

compelling legal argument that the ALJ erred by relying on frequency of hand-related complaints in the medical record as a litmus test for the limiting effects of these symptoms.

### D.    The ALJ's Function-By-Functions Analysis Complies with Social Security Ruling 96-8p

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," and it must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." SSR 96-8p, 1996 WL 374184, at *3 & *7.

Plaintiff vaguely claims the ALJ failed to conduct the required function-by-function analysis without pointing to any exertional or nonexertional demands the ALJ overlooked. (ECF No. 7:25-28); *see also* (ECF No. 7:27 (citing *Weigel v. Astrue*, 425 F. App'x 706, 708-09 (10th Cir. 2011), as "not[ing] that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts")). Plaintiff's argument is not adequately developed for review. *See Keyes-Zachary*, 695 F.3d at 1161. However, the Court notes that the ALJ analyzed Plaintiff's exertional and nonexertional abilities, comparing her claims of limitation with the symptoms reported in her medical records and with nonmedical evidence. *E.g.*, (TR. 25 ("In addition, the claimant testified that her right index finger was injured in a car wreck, causing pain and cramping in her hands when she writes. She said that she has difficulty holding things and drops items and has problems picking up small items. When she picks things up, she said that it is painful, and she gets a sharp nerve feeling and her hand will

lock up. She detailed that this happens about 1-2 times a week depending on what she is doing. She indicated that she has the same type of problems with the left, but the right is worse. She said that both hands swell and that she has swelling in her feet and legs. She said that she takes water pills and must elevate her feet to deal with swelling, which she does once per day.")); *see also* (TR. 34 (considering the third-party function report filed by Plaintiff's mother, which describes difficulty using her hands). This after the ALJ correctly identified her obligation to "consider all of the claimant's impairments, including impairments that are not severe." (TR. 19 (citing SSR 96-8p)). And as previously noted, the ALJ surveyed Plaintiff's complaints of pain to medical providers before concluding, "The record overall does not support a conclusion that manipulative tasks would have been limited to less than frequent for any consecutive 12-month period since the application date." (TR. 31-32). Given the ALJ's correct identification of her obligation and her thorough analysis of the record, the undersigned finds the ALJ's function-by-function analysis adequate.

Plaintiff next argues that the state-agency consultants' opinions were not a valid basis for the manipulative restrictions in Plaintiff's RFC because the ALJ found their opinions only "somewhat persuasive." (ECF No. 7:28-29). The non-examining consultants, having reviewed the record in August and December 2022, found Plaintiff could perform the full range of light exertional work. (TR. 34). The ALJ found this opinion only somewhat persuasive because the state-agency consultants did not have the benefit of the entire medical record, including important rheumatology developments. (TR. 34-35). Having reviewed the entire record, including the rheumatology records post-

dating the consultants' review, the ALJ limited Plaintiff to frequent—rather than constant—reaching, handling, and fingering. (TR. 24). Plaintiff summarily argues that "[b]ecause the ALJ did not find the [state-agency consultants'] evaluations consistent with all of the medical records, the [] evaluation[s] could not have formed a basis for the ALJ['s] RFC." (ECF No. 7:29). However, the ALJ did not find the state-agency consultants' opinions inconsistent with the record before them for review. She found them just somewhat persuasive only in light of subsequent records, and she adjusted their findings accordingly. To the extent Plaintiff argues it is improper to rely on expert opinions found to be only somewhat persuasive, she cites no cases to support this proposition, and the undersigned has only found contrary authority. *E.g.*, *Gray v. O'Malley*, No. CIV-23-775-HE, 2024 WL 4343105, at *6-7 (W.D. Okla. May 20, 2024) ("In discounting Plaintiff's consistency, the ALJ also considered the physical findings of [the] consultative examiner . . ., finding them to be 'somewhat persuasive as somewhat consistent with and supported by the evidence of record.' . . . The ALJ appropriately weighed the subjective evidence of Plaintiff's back pain treatment. She has not demonstrated the ALJ's RFC assessment lacked substantial evidence." (internal citations omitted)), *adopted*, 2024 WL 4341601 (W.D. Okla. Sept. 27, 2024).

Finally, Plaintiff argues the ALJ did not perform the required function-by-function assessment of Plaintiff's manipulative ability. (ECF No. 7:29-31). Specifically, Plaintiff takes issue with the how the ALJ weighed her subjective complaints about her capabilities against the frequency of her hand-related complaints to treatment providers. Plaintiff presents the ALJ's emphasis on frequency of complaints as an evasion of the function-

by-function analysis requirement. However, the ALJ discusses frequency in the context of a narrative discussion of Plaintiff's subjective complaints and her providers' medical findings—the evidence supporting the ALJ's conclusion that Plaintiff retains the capacity for frequent manipulation, as required by SSR 96-8p. Plaintiff points to no significantly probative evidence not considered by the ALJ. *See Clifton*, 79 F.3d at 1010 ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects."). The ALJ's analysis is consistent with SSR 96-8p. Having found no error, the Court need not address Plaintiff's harmlessness argument.

## VI.    RECOMMENDATION AND NOTICE OF RIGHT TO OBJECT

Having reviewed the medical evidence of record, the transcript of the administrative hearing, the decision of the ALJ, and the pleadings and briefs of the parties, the undersigned magistrate judge recommends that the decision of the Commissioner be **AFFIRMED**.

The parties are advised of their right to file specific written objections to this Report and Recommendation. *See* 28 U.S.C. § 636 and Fed. R. Civ. P. 72. Any such objections should be filed with the Clerk of the District Court by **May 14, 2025**. The parties are further advised that failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein. *Casanova v. Ulibarri*, 595 F.3d 1120, 1123 (10th Cir. 2010).

## VII.  STATUS OF REFERRAL

This Report and Recommendation terminates the referral by the District Judge in this matter.

ENTERED on April 30, 2025.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE